## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

**SAFET STAFA, TOLLBROOK, LLC,**
**a Michigan limited liability company,**
**TOLLBROOK WEST LLC, a**
**Michigan limited liability**
**company, TOLLBROOK**
**NORTH, LLC, a Michigan limited**
**liability company, and ARBAN**
**STAFA,**

|                              |                            |
|------------------------------|----------------------------|
| **Plaintiffs,**              | **Case No.**               |
| **v.**                       |                            |
| **CITY OF TROY, MICHIGAN, a** | **JURY TRIAL REQUESTED**   |
| **Michigan municipal corporation,** |                     |
| **Defendant.**               |                            |

## <u>COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF</u>

Plaintiffs Safet Stafa, Tollbrook, LLC, Tollbrook West LLC,

Tollbrook North, LLC, and Arban Stafa, by and through their counsel,

hereby state for their complaint against defendant the City of Troy,

Michigan as follows:

## <u>NATURE OF THE ACTION AND JURISDICTION</u>

This is a civil action:

(a)    arising under the Constitution and laws of the United States and this Court has original federal jurisdiction pursuant to 28 U.S.C. §1331 and 18 U.S.C. §1964;

(b)    to redress the deprivation, under the color of law, of the rights, privileges and immunities of plaintiffs secured by the Constitution of the United States providing for equal rights of its citizens and of all persons of any jurisdiction of the United States, and this Court has original jurisdiction pursuant to 28 U.S.C. §1343(3); and

(c)    for monetary and declaratory judgment and injunctive relief pursuant to 42 U.S.C. §1983, and this Court has jurisdiction pursuant to 28 U.S.C. §1343(4).

The principal events giving rise to the claims stated herein occurred in this District, and venue is therefore proper in this District pursuant to 28 U.S.C. §1391(b).

This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §2201 and §2202.

## **THE PARTIES**

1.    Plaintiff Safet Stafa ("Sam Stafa") is an individual who resides in Oakland County, Michigan.  Sam Stafa is Muslim.

2.      Plaintiff Tollbrook, LLC ("Tollbrook") is a Michigan limited liability company organized and existing under the laws of Michigan, with its principal office and place of business located in Oakland County, Michigan.

3.      Plaintiff Tollbrook West LLC ("Tollbrook West") is a Michigan limited liability company organized and existing under the laws of Michigan, with its principal office and place of business located in Oakland County, Michigan.

4.      Plaintiff Tollbrook North, LLC ("Tollbrook North") is a Michigan limited liability company organized and existing under the laws of Michigan, with its principal office and place of business located in Oakland County, Michigan.

5.      Plaintiff Arban Stafa ("Arban Stafa") is an individual who resides in Oakland County, Michigan.  Arban Stafa is Muslim.

6.      Defendant the City of Troy, Michigan ("the City") is a municipal corporation with its principal offices in Oakland County, Michigan.

## GENERAL ALLEGATIONS

7.      Plaintiff Sam Stafa is the managing member of Tollbrook, Tollbrook West and Tollbrook North and many other companies, including Sterling Construction, Inc. ("Sterling Construction").  Sam Stafa, through his companies, has developed numerous properties in the City since at least 2008.

8.      Prior to 2016, Sam Stafa and his companies interacted with City staff, the Planning Commission and City Council for development of each of the projects for many years, and the interaction was professional and in accordance with City ordinances, without any incident or difficulty in obtaining approvals or building the projects.  Sam Stafa and his companies had a good reputation with the City and its representatives because of the quality of their projects and construction.

9.      Sam Stafa, through another one of his companies, Tollbrook, acquired three parcels of property located on the east side of McClure Road, north of Big Beaver, in the City of Troy, which totaled 2.57 acres ("McClure Property").

10.      On June 14, 2016, Tollbrook submitted a request to the City to conditionally rezone the McClure Property from R-1B (One

Family Residential) District to the BB (Big Beaver) District for the purpose of developing the McClure Property as a multi-family housing project called "The Lofts."

11.    The McClure Property is located within the area designed as BB (Big Beaver) District on the City Master Plan.

12.    The Master Plan designation of BB District responds to the recommendations set forth in the City's Big Beaver Corridor Study, which promotes flexibility with land use relationships including higher density, vertically integrated mixed-use commercial, office and residential towers.

13.    The City's Big Beaver Corridor Study and Master Plan promote redevelopment with a greater mix of land uses, particularly new residences, but also encourages the use of prominent ground floor retail, restaurants and cafes allowing visual interest and activity for visitors and residents.

14.    City representatives solicited Sam Stafa and promised him that if he and his company, Tollbrook, followed their direction, he would be the trailblazer for the establishment of the Big Beaver Corridor concept by constructing a high-density residential development.

- 5 -

15.     City representatives advised Sam Stafa and Tollbrook on what to do to put together the concept for The Lofts.

16.     By this time, the City had approved in the same area a tall tower, Monarch, with high-density residential development, which was so tall it had to obtain approval from the Federal Aviation Administration because of a nearby airport.  The Monarch project, which consisted of two high-rise towers and townhomes, was approved, but not completely built.  The property was sold to another developer and the City approved a Planned Unit Development which allowed a one-story strip mall and a row of detached site-condominiums, even though this was not consistent with the City's Master Plan or the Big Beaver Corridor concept.

17.     Tollbrook received comments and ideas from the City Planning Commission and resubmitted its conditional rezoning request to the City on July 27, 2016, December 9, 2016 and January 30, 2017.

18.     Each time Tollbrook resubmitted its conditional rezoning request, it made substantive changes to the proposed site plan for The Lofts to accommodate the comments and ideas it received from the City and its representatives.

19.    Among other changes which Tollbrook made to the Lofts site plan at the request of the Planning Commission, City staff and planning consultants, before the final request for conditional rezoning and approval of the Lofts site plan, Tollbrook also:

(a)    reduced the number of stories from six to three along the northern edge of the building and transitioning to five stories further south;

(b)    reduced the number of residential units to 140;

(c)    increased the building set back as an additional transitionary feature along the northern property line, which is adjacent to single family residential, from 60 feet to 131.12 feet;

(d)    revised the mix of units to provide 63 efficiency units;

(e)    added to the site plan 24 onsite parking spaces; and

(f)    agreed to remove the landscaping along the northern and eastern property lines in order to accommodate additional onsite parking.

20.    The final Lofts conditional rezoning request and request for site plan approval, which was submitted to the City on January 30, 2017, showed a tiered three-story to five-story, 140-unit multi-family project with 223 designed parking spaces.

21.     Tollbrook also submitted a traffic study that demonstrated that the Lofts project as proposed would have no negative impact on surrounding area roads, land uses or the public in general.

22.     Sam Stafa and Tollbrook ensured that the Lofts project complied with all local zoning requirements for the BB District, including parking, as well as the City and Oakland County requirements and standards relating to civil engineering, traffic engineering, environmental concerns, infrastructure, police, fire and emergency rescue.

23.     The City Planning Commission met on February 14, 2017, and voted 7-0 to recommend to the City Council that it approve Tollbrook's conditional rezoning request and request for approval of the site plan for The Lofts pursuant to the City Zoning Ordinance Section 16.04.C (Exhibit 1 at 2-4).

24.     The City Planning Commission determined that The Lofts project met the requirements of City Zoning Ordinance Section 16.04.C, which require consideration of these factors:

(a)     Site design, and specifically the conditions offered by the applicant through the site plan, protects public health, safety and welfare.

(b)    The application is consistent with the Master Plan.

(c)    Conditions offered by the applicant are consistent with the zoning district proposed.

(d)    The site can be serviced with public facilities.

(e)    Conditions offered by the applicant ensure compatibility with adjacent land uses and provide the appropriate transition features to mitigate impact of use, intensity and massing.

(*Id.*).

25.    Sam Stafa's religion had never been raised at any time in his interactions with the City and its representatives prior to this point.

26.    But after the February 14, 2017 meeting, a local politician, Andrew "Rocky" Raczkowski, who unsuccessfully opposed plaintiffs' project at the Planning Commission meeting, began lobbying the City Council to vote against the conditional rezoning request and approval of the site plan for The Lofts, as he had a professional political relationship with some of them, and incited others living in the surrounding area to join him in these activities.

27.    Raczkowski had hired one of Sam Stafa's companies, Sterling Construction, a few years earlier to build his house, but misrepresented the square footage of the house to try to decrease

the price of the house and then refused to pay for it, causing Sterling Construction to have to file suit against Raczkowski (Exhibit 2).

28.   Raczkowski told Sam Stafa that he would "bleed [him] to death" and continued making such statements despite receiving a cease-and-desist letter from Sterling Construction's attorney to Raczkowski's attorney to stop Raczkowski from disparaging Sam Stafa (Exhibit 3).

29.   Raczkowski referred to Sam Stafa as "that Muslim builder" and Sam Stafa began to hear that expression from others as he worked to advance the Lofts project.

30.    Raczkowski organized a "Go Fund Me" page to raise money in opposition to the Lofts project (Exhibit 4), created robocalling campaigns against the project, circulated a petition (Exhibit 5) and placed an advertisement against the project in the local newspaper.

31.   At the April 10, 2017, City Council meeting, after a public hearing that included incendiary and not fact-based opposition to The Lofts project, the City Council voted 4-3 to deny approval of The Lofts requests, despite the fact that the original proposed motion was to approve the project, and it was pointed out at the meeting that

plaintiffs voluntarily offered and would pay for a number of improvements for the City, listed as conditions in the proposed Conditional Rezoning Agreement, that the proposed rezoning was supported by the Master Plan and advanced the general and specific development policies of the Master Plan, and that the proposed site design mitigated the potential impacts on adjacent properties (Exhibit 6 at 4-7).

32.    Plaintiffs were completely blindsided by this decision, and attempted to find out what it could do to remedy the situation, to no avail.

33.    After the denial, Sam Stafa wanted to get feedback from then City Council member and now Mayor Ethan Baker, who voted against the project.  This surprised Sam Stafa as Baker had voiced no concerns during a telephone conversation regarding the Lofts project before the project was considered.

34.    Sam Stafa met with Baker to discuss the denial of the project.  Baker told Sam Stafa that if Sam Stafa could not get the project approved if Raczkowski was opposed to him.

35.    In discussions Sam Stafa had with Planning Director R. Brent Savidant, Sam Stafa was told that if Raczkowski had not

opposed the Lofts project, Sam Stafa would already be building by that time.

36.     Believing that it had no other recourse, on May 4, 2017, Tollbrook filed a complaint alleging violation of its constitutional right to substantive due process pursuant to 42 U.S.C. §1983, among other claims.

37.     Once Tollbrook filed suit, the City made it clear, through the actions taken against all plaintiffs from that date to the present, that Sam Stafa and any company he owned and his son, Arban Stafa, would be stopped and delayed and hindered in any building project that any of the plaintiffs attempted in the City, in retaliation for plaintiffs having exercised their First Amendment rights by seeking redress through the courts.

38.     The City's actions, as detailed below, are retaliatory actions in violation of plaintiffs' constitutional rights, as guaranteed by the First Amendment to the U.S. Constitution, and a deprivation of plaintiffs' rights to equal protection of the law, as guaranteed by the Fourteenth Amendment to the U.S. Constitution.

39.     After the denial by the City Council on April 10, 2017, plaintiffs again applied to re-zone to BB zoning the McClure Property

and properties nearby that plaintiffs owned on Alpine Drive ("the Alpine Drive Property"), but without any rezoning conditions (the City refers to these types of requests as "straight" rezoning requests).

40.     The City initially would not take plaintiffs' rezoning requests, for no legitimate reason, but finally placed the McClure Property and the Alpine Property projects on the agenda of the May 28, 2019 meeting of the Planning Commission, which denied the request (Exhibit 7 at 2-8).

41.     In correspondence to the City Council regarding the McClure Property dated July 15, 2019, Robert J. Bruner, Assistant City Manager, and R. Brent Savidant, Planning Director, stated the standards to be met for a proposed rezoning:

1.     The proposed rezoning is consistent with the Master Plan. If the current zoning is in material conflict with the Master Plan, such conflict is due to one of the following:

    a.     A change in policy since the Master Plan was adopted.
    b.     A change in conditions since the Master Plan was adopted.
    c.     An error in the Master Plan.

2.     The proposed rezoning will not cause nor increase any non-conformity.

3.     Public services and facilities affected by a proposed development will be capable of accommodating service and facility loads caused by the use of the development.

4.     The rezoning will not impact public health, safety, or welfare.

5.     The rezoning will ensure compatibility with adjacent uses of land.

(Exhibit 8).

42.     Almost identical correspondence was sent to the City Council regarding the Alpine Drive Property (Exhibit 9).

43.     When Tollbrook submitted its rezoning application for the McClure Property, it proposed to construct two structures, a three-story mixed use office/residential building and a three-story apartment building, which was clearly spelled out in the application (Exhibit 10).

44.     When Tollbrook West submitted its rezoning application for the Alpine Drive Property, it proposed a three-story mixed use office/residential building, which was clearly spelled out in the application (Exhibit 11).

45.     As noted in the correspondence to City Council, the City's zoning ordinance requires the applicant to indicate a proposed use of the property, but it is not binding on the applicant and the City has no

ability to take any action on the concept plan as part of the rezoning application process (Exhibits 8 and 9).

46.     On July 22, 2019, the City Council denied the "straight" rezoning requests of both Tollbrook and Tollbrook West (Exhibit 12).

47.     The City Council's reasons for both denials were almost identical (*Id.*).

48.     While the City Council admitted that the rezoning was compatible with the Master Plan, it denied the rezoning applications primarily on the basis that the future use of the properties was unknown, despite the fact that plaintiffs had clearly identified their intended future use (*Id.*).

49.     The City's actions in blocking and preventing plaintiff from developing the McClure Property and the Alpine Drive Property were unwarranted and wrongful and part of a municipal policy to wrongfully harass plaintiffs and were in retaliation for plaintiffs having exercised their First Amendment rights to seek redress from the courts and contrary to plaintiffs' rights to equal protection of the law.

50.     On November 12, 2019, Sam Stafa entered into an Agreement of Sale conditioned on site plan approval, to purchase a 5.72-acre parcel on the west side of Crooks Road, just north of

Wattles Road, in the City of Troy ("Crooks Road Townhomes Project").

51.    Given what had occurred with the McClure Property and the Alpine Drive Property, Sam Stafa confirmed that the proposed use was permitted as a right.  Multi-family residences were permitted by right in the Neighborhood Node ("NN") Zoning District.

52.    Plaintiffs made sure that the site plans that they submitted to the City Planning Commission complied with the NN District requirements and that they and their consultants were responsive to any request from the City.

53.    Despite these efforts, the City made it clear to plaintiffs that the Crooks Road Townhomes Project would never be approved.

54.    The City continually delayed consideration of the Crooks Road Townhomes Project.

55.    Every time plaintiffs requested consideration of the Crooks Road Townhomes Project, the City found some way to delay or not schedule that consideration.

56.    The City forced plaintiffs to meet with the neighbors and send them a mailing piece, even though that is not required by the City Zoning Ordinance.

57.   The City created a special group called the "Development Review Committee" to meet about the Crooks Road Townhomes Project, even though no such committee was authorized by the Zoning Ordinance, and refused to allow plaintiffs to attend the Development Committee meeting, at which there was no agenda (Exhibit 13).

58.   After having had plaintiffs' plans for several months, the City intentionally delayed informing plaintiffs of something readily apparent to the City - that plaintiffs' initial site plans included a parcel that was not zoned "NN" which would have to be removed, causing the entire site plan to be configured; otherwise, plaintiffs would have to submit a new application to rezone the property (Exhibit 14).

59.   The City waited until there was a meeting of the so-called "Development Review Committee," which allegedly involved multiple City departments such as fire, assessment and City management, to advise plaintiffs of this issue (*Id*.)

60.   It became apparent to plaintiffs and their outside planning and design professionals that the City would use any tactic it could to kill the project, so that plaintiffs' planning professional advised plaintiffs, "It is really lousy that they waited months before saying

anything and they are either horrible planners or just plain vindictive"
(*Id.*).

61.    After repeated requests by plaintiffs, the Crooks Road
Townhomes Project was finally placed on the Planning Commission's
agenda on September 24, 2019.

62.    At the meeting on September 24, 2019, the Planning
Commission tabled the decision on approving the site plan for the
Crooks Road Townhomes Project (Exhibit 15 at 2-4).

63.    Plaintiffs then purchased a three (3) acre parcel to the
south of the Crooks Road Townhomes Project to avoid the access
issue on which the City had raised.

64.    Immediately thereafter, Sam Stafa commissioned
architectural and engineering firms to make modifications to a
preliminary site plan for the Crooks Road Townhomes Project, which
was submitted to the City in November, 2019 and placed on the
agenda of the Planning Commission for its meeting scheduled for
January 14, 2020 (Exhibit 16).

65.    Plaintiffs' preliminary site plan for the Crooks Road
Townhomes Project was for the construction of 74 townhomes in 13
buildings, a permitted use under the existing Neighborhood Node

(NN) District zoning.  The plan required no variances, waivers or exceptions. Moreover, the planned project was modest in size and scope and met all the requirements under the applicable NN ordinance.

66.    The City's planning consultant, Benjamin Carlisle, issued a report dated January 7, 2020, which found that the proposed use was appropriate for the site (Exhibit 17).  It set forth a few requests and recommended postponing consideration of the project so that plaintiffs could address the requests (*Id*.).

67.    Because plaintiffs had been delayed so long, their planning professional immediately addressed the concerns, sending email correspondence to R. Brent Savidant and Benjamin Carlisle to confirm this, so that the Crooks Road Townhomes Project could be considered at the January 14, 2020 Planning Commission Meeting (Exhibit 18).

68.    Yet at its January 14, 2020 meeting, the Planning Commission raised different issues, causing plaintiffs to have to seek to have consideration of the Crooks Road Townhomes Project postponed "to allow an opportunity to respond to and investigate comments made this evening (Exhibit 19).

69.    The minutes of the January 14, 2020 Planning Commission meeting state that "[Assistant City Attorney] Dufrane interjected the discussion to state the proposed development is permitted by right on the subject property (Exhibit 19 at 5).

70.    At this same Planning Commission meeting, the next agenda item, "Square Lake Court Townhomes," was also a three-story townhome project in a Neighborhood Node (NN) District.  The Planning Commission approved this project's site plan at this first meeting and allowed it to address any technicalities administratively (*Id*. at 6).

71.    Square Lake Court Townhomes was objectively more intense than the Crooks Road Townhomes on a unit per-acre basis.  The City Planning Department received email correspondence from Arban Stafa outlining a comparison between the project on January 15, 2020, which showed:

| | Crooks Rd Townhomes | Square Lake Court |
|---|---|---|
| Application Type | Preliminary Site Plan | Preliminary Site Plan |
| Proposed Use | Townhome Attached | Townhome Attached |
| Zoning | NN-I | NN-N |
| | Site Type B, Street Type A | Site Type B, Street Type A |
| **Setback (Adjacent to Single Family)** | **40 ft** | **34.54 ft** |
| Height | 33-1 Ft | 34-4 ft |
| Stories | 3 | 3 |
| Guest Parking | 34 | No Dedicated Guest Parking as per submitted plans |
| Acres | 5.72 | 0.87 |
| Units | 74 | 14 |
| Density Units/Acre | 13 per acres | 16 an acres |
| Site Landscaping | 55% | 30% |

(Exhibit 20).

72.     Additionally, the comments of the Planning Commission were drastically different between the two projects, even though the two projects were very similar.  As Arban Stafa stated in his January 15, 2020 email correspondence:

> Certain planning members had issues with our height, density, impact, compatibility adjacent to single family, lack of "park like features" while, a Square Lake Court a similar denser project with less green space and adjacent to single family residential was approved at the Planning Commission meeting yesterday 1/14/2020 with no issues at all brought up by the Planning Commission members other than a cross access with another property.

(*Id.*).

73.     At its January 13, 2020 meeting, the City Council appointed an opponent of plaintiffs, Marianna Perakis, as a Planning

- 21 -

Commission member (Exhibit 21 at 2).  Perakis was a vocal opponent

of plaintiffs' McClure and Alpine projects, angrily speaking at multiple

public hearings and even appearing on a WXYZ-TV Channel 7 news

clip (https://www.youtube.com/watch?v=nNtS2vD11Ew)

74.    Perakis uses an aggressive tone against any project of

plaintiffs, and plaintiffs have requested her recusal on multiple

occasions at public meetings, but she has refused to recuse herself

(Exhibit 19).

75.    The Oakland County Sheriff's Department has

investigated Perakis and others for placing fake signatures on

petitions (Exhibit 22).

76.    The City's retaliation against plaintiffs did not stop with

rejection of the Crooks Road Townhomes Project.

77.    In December, 2019, plaintiffs submitted a site plan

application for a project called "The Westington" ("the Westington

Project").

78.    This site was also located in the southeast corner of

Wattles Road and Crooks Road and was also zoned Neighborhood

Node (NN) District, a district in which multi-family residences are

permitted by right.

79.     To try to stir up controversy and public backlash from the public for plaintiffs' the Westington Project, the City singled out the project and initially placed a "Site Plan Application" A-frame sign in front of the property, even though, at the time, signage was only mostly placed on properties that involved public hearings, which this application did not require (Exhibit 23).

80.     Sam Stafa returned the sign to the City Planning Department, notifying the City that it did not consent to the placement of an A-frame sign, as the Site Plan Application form did not contain language which gave the City permission to place a sign on the property, unlike other applications which required a public hearing and which contained language allowing the City to place signs on the subject property (Exhibit 24).

81.     The City then created installed a custom-made mounted metal sign it made for the Westington Project, but then came back and removed the sign.

82.     The neighbors in the front of the property told Sam Stafa that they were amused by the back-and-forth games the City was playing with signage on plaintiffs' property.

83.    The City then stated it would revise the Site Plan Application form after Sam Stafa pointed out that there was no language in the application that allowed the City to post signs on plaintiffs' property (*Id.*).

84.    The City continued its pattern of unreasonable delays in considering the Westington Project.

85.    Plaintiffs made several requests for the status of when the Westington Project would be placed on the Planning Commission's agenda, but were told it was still "under review" (Exhibit 25).

86.    The City finally advised plaintiffs that the request for approval of the site plan for the Westington Project would be placed on the February 25, 2020 agenda of the Planning Commission.

87.    However, contrary to past practice with other applicants, the City refused to provide plaintiffs with its planning consultant's report to give the time and opportunity to make corrections and revisions, as required before being considered by the Planning Commission.  Instead, the report was withheld from plaintiffs and only released with the distribution of the public agenda, which is released on the afternoon of the Friday immediately preceding the Tuesday meeting, which is one business day prior to the meeting.

88.     Having been through this routine before, plaintiffs asked to have the request for approval of the site plan for the Westington Project removed from the February 25, 2020 Planning Commission agenda so that revisions and corrections could be made to the plans (Exhibit 26).

89.     As to the Crooks Road Townhomes Project, plaintiffs made changes to the site plan based on the comments of the Planning Commission and the public at the January 14, 2020 meeting and submitted a revised plan on March 16, 2020.

90.     The City refused to reschedule the hearing on the Westington Project in March, 2020, and did not schedule the hearing until the April 14, 2020 Planning Commission meeting.

91.     Then, on April 7, 2020, citing the Governor's "Stay at Home" order, the City cancelled the Planning Commission meeting (Exhibit 27), and refused to hold the meeting through remote access, even though City Council meetings, which had significant public comment, were being held through remote access.

92.     On May 11, 2020, the City advised plaintiffs that it would not hold a remote access hearing on the Westington Project because

of challenges providing resident input during remote public meetings (Exhibit 28).

93.     Plaintiffs wrote back to the City about this decision, since the agenda item was just for a site plan which did not require a noticed public hearing (Exhibit 29).

94.     On May 13, 2020, the City responded that the Westington Project was being treated differently because it was in a Neighborhood Node district which would bring significant public participation (Exhibit 30).

95.     Yet on April 28, 2020, the City Planning Commission held its meeting through remote access and approved a site plan for another developer's project which was also in a Neighborhood Node District (Preliminary Site Plan Review File Number SPJPN2020-0004), which was similarly-situated to plaintiffs' Westington Project (Exhibit 31 at 4-5).

96.     On May 26, 2020, plaintiffs sent email correspondence to the City, pointing out the differences in treatment of another similarly-situated project, Square Lake Court, and plaintiffs' Westington Project (Exhibit 32).

97.    The City delayed consideration of the Westington Project for eight months, refusing to hold a Planning Commission meeting to consider the project for a variety of changing reasons, while holding City Council meetings by remote access (Exhibit 33).

98.    For example, having finally scheduled the Westington Project for the October 13, 2020 Planning Commission meeting, the City canceled it on October 12, 2020, claiming that the decision of the Michigan Supreme Court striking down the Governor's emergency orders made it not possible for the City to hold a meeting through remote access (Exhibit 34).

99.    Yet on the evening of October 12, 2020, the City held its City Council meeting by remote access, *after* having notice of the Michigan Supreme Court decision.

100.  The City finally placed the Westington Project's preliminary site plan on the Planning Commission's agenda for the October 27, 2020 meeting after waiting since March 2020 for placement of the Westington Project on the agenda.

101.  The City finally placed the Crooks Road Townhomes Project's preliminary site plan on the Planning Commission's agenda

for the November 10, 2020 meeting even though the revised

preliminary site plan had been submitted on March 16, 2020.

102.   As part of the City's attempt to further stir up controversy

and try to bring public attention to the Westington Project, Mayor

Baker posted on his Facebook, Instagram, and Twitter regarding that

the Westington Project would be going before the City Planning

Commission.

103.   Mayor Baker had never posted on his social media

platforms in the past regarding any similar project seeking site plan

review at a Planning Commission meeting.

104.   When Arban Stafa sent email correspondence to Mayor

Baker on October 11, 2020, regarding this unusual behavior, Mayor

Baker stated that he "wanted to make sure the pubic was aware of

the meeting(s)..." (Exhibit 35).

105.   Despite repeated requests over the eight months that the

City had the Westington Project's preliminary site plan submittal,

plaintiffs only received the report of the planning consultant one

business day before the Planning Commission meeting.

106.   Plaintiffs learned that now the City was claiming that there

were issues as to compatibility and transition.

107.   On November 10, 2020, the Planning Commission denied Stafa's request for approval of the preliminary site plan for the Crooks Road Townhomes Project, first using safety as a reason, and then when it was pointed out that plaintiffs met the safety requirement, it was changed to the unsubstantiated statements of "lack of compatibility and inadequate transition" (Exhibit 36 at 6-9).

108.   The Crooks Road Townhomes Project is the first time a permitted-by-right site plan application, which sought no variances, had ever been denied in the history of the City.

109.   Instead of administering its site plan "design standards" to plaintiffs' site plan, the Planning Commission used its "design standards" as a purported basis to deny approval of a site plan that was permitted as of right under the Zoning Ordinance, even though there is no statute or City ordinance which permits this action or which permits the Planning Commission to legislate, in effect, by denying a use granted as of right under the Zoning Ordinance.

110.   Plaintiffs appealed the decision to the City Zoning Board of Appeals ("ZBA"), which denied the appeal on January 19, 2021 (Exhibit 37).

111.   The City finally approved the Westington Project on December 8, 2020.

112.   The City Council then appointed Gerald Rauch to the Planning Commission, with his first Planning Commission meeting occurring on January 12, 2021.  Mr. Rauch was known as an outspoken opponent of the Crooks Road Townhomes Project.  Mr. Rauch also filed a motion to intervene to be named as a co-defendant with the City in a prior lawsuit related to the Crooks Road Townhomes Project.

113.   After Mariana Perakis, Mr. Rauch is the most well-known and outspoken opponent of plaintiffs' projects.

114.   With the appointment of Ms. Perakis and Mr. Rauch, the City intentionally placed two well-known opponents of any project brought by plaintiffs on the City Planning Commission.

115.   Knowing what plaintiffs intended to do with their properties adjacent to the Westington Project, the City took steps to ensure that the projects would not be economically feasible and to hinder plaintiffs' development of their projects.

116.   In May, 2021, the City scheduled a public hearing before the City Council on a Zoning Ordinance text amendment ("ZOTA

255").  The text amendment set forth in ZOTA 255 substantially changed Section 5.06.E.3 of the Zoning Ordinance.  Section 5.06.E.3(c) added a new restriction that buildings on parcels abutting a one-family residentially zoned parcel could not exceed 2.5 stories and 30 feet in height (Exhibit 38).  It also added Section 5.06.E.3(d), "Setback and Greenbelt," which were not part of Section 5.06.E.3 before (*Id*.).

117.   ZOTA 255 was directed to and specifically affected plaintiffs' properties.

118.   Plaintiffs had properties adjacent to the Westington Project for which they were preparing new site plan applications for submittal to the City and the City was aware of this fact as early as the pre-application meeting for the Westington Project.

119.   One of the projects for which plaintiffs were preparing an application - Hills West, located at 3902 Crooks Road in the City of Troy - has no one-family homes adjacent to it, but it was adversely affected by ZOTA 255 because there was allegedly a one-family residentially zoned parcel adjacent to it, which actually was an unbuildable private road.

120.   ZOTA 255 used the word "parcel" - which includes all parcels whether buildable or non-buildable - instead of "lot," which the Zoning Ordinance defines as "parcel of land occupied, or intended to be occupied by a main building or a group of such buildings and accessory buildings, or utilized for the principal use and uses accessory thereto, together with such open spaces as are required under the provisions of this Ordinance" (Exhibit 39 at page marked 20).

121.   Article 2 of the Zoning Ordinance, which sets forth definitions, does not contain a definition of "parcel" (Exhibit 39).

122.   ZOTA 255 was not narrowly tailored and was intentionally drafted in an overbroad way to adversely affect plaintiffs' property as the plaintiffs owned the only property in the NN District that was not adjacent to any buildable one-family lot but was located next to a private road, Barilane Drive.

123.   ZOTA 255 drastically reduced the permitted scale and units allowable on the Hills West property.

124.   ZOTA 255, as applied, is invalid as it only targets 3902 Crooks Road - the Hills West Project, as it is the only property in a Neighborhood Node District that is not adjacent to one-family lots.

- 32 -

125. The City has continued its retaliatory actions against plaintiffs.

126. On September 8, 2021, Sam Stafa sent email correspondence to the City Engineering Department asking when the building permit for Building "D" of the Westington Project would be released (Exhibit 40).

127. The City Engineer responded to this email correspondence by stating, "The engineering department will recommend building permit issuance for individual buildings on a project site when the buildings in question have utility service and unrestricted paved access" (*Id.*).

128. Arban Stafa sent email correspondence to the City Engineer on September 10, 2021, advising that there was another project, "The Regency of Troy," on Maple Road just east of Axwell that was currently being built vertically where there is no "unrestricted paving access" and no "utility service," and providing a picture of this construction (*Id.*).

129. It was only after it was clear that there was disparate treatment did the City release the building permits for Building D of the Westington Project.

130.   Plaintiffs submitted the Hills West and Westington Phase II Preliminary Site Plan application on October 14, 2021 for a combined 60-unit, two and one-half story multi-family apartments in four buildings.  Multi-family apartments are permitted by right in the Neighborhood Node (NN) District.

131.   The Hills West and Westington Phase II properties were adjacent to the approved Westington Project, which was under construction at that time.

132.   The Planning Commission on January 25, 2022 reviewed plaintiffs' site plan application and denied the application for Hills West and Westington Phase II based on subjective and vague reasoning without explanation or support, even though the project fully complied with the NN zoning standards as well as the newly enacted ZOTA 255 (Exhibit 41).

133.   At this point in time, the only projects in the history of the City of Troy that were permitted uses by right that were denied were plaintiff's projects - the Crooks Road Townhomes Project, Hills West and Westington Phase II.

134.   On March 3, 2022, the City sent plaintiffs' then-counsel a letter demanding all communication by plaintiffs with the City must be

directed solely to the City Attorney's office, unlike the way other

developers in the City could communicate with the City (Exhibit 42).

The City's letter even stated that plaintiffs could not communicate

with anyone else in the City because they had brought litigation

against the City (*Id.*).  Any planning related questions had to be

brought to the City Attorney's office instead of the Planning Director,

unlike the manner in which the City treated other developers.

135.  Plaintiffs' then-counsel responded to the City Attorney

regarding this letter on March 8, 2022, pointing out the disparity, to no

avail (Exhibit 43).

136.  Arban Stafa then sent email correspondence on March

16, 2022 to City representatives about the City's difference in the

treatment of plaintiffs contrasted to the treatment of others (Exhibit

44).

137.  Because the City refused to have communication with

plaintiffs other than through the City Attorney's office, correspondence

between plaintiffs and the City departments would often be delayed

and it would take longer to get a response than it would have had the

City department been able to correspondence directly with plaintiffs.

138.   In 2022 the City announced that it was amending its master plan as to the Neighborhood Node Districts, the districts in which the majority of plaintiffs' properties are located, and set up a sub-committee of a few Planning Commission members to discuss the changes to the master plan.

139.   On April 13, 2022, plaintiff Arban Stafa sent email correspondence to the City, requesting that the subcommittee meetings be recorded and uploaded to YouTube, just as the City did for its Planning Commission meetings (Exhibit 45).

140.   The City did not respond until April 29, 2022, stating that the City could not do that because, "The City only has limited IT staff available to record and broadcast meetings, and the priority is to record City Council meetings and those meetings authorized to be recorded by City Council such as regular meetings of ZBA and Planning Commission" (Exhibit 46).

141.   After the Hills West and Westington Phase II site plans were denied on January 25, 2022, plaintiffs submitted new site plan applications and was seeking clear feedback from the City on how they would comply with the zoning ordinance, as the site plan applications were for developments that were permitted as of right.

142.   Plaintiffs noticed, through their attendance at Planning Commission meetings, that when the Planning Department reports for projects ended in a "recommendation," the Planning Commission subsequently approved the projects.

143.   The City Planning Director confirmed this occurrence in an interview reported in a news article, in which he stated, "Generally speaking, if they meet all of the requirements, we recommend approval and they can get approval at the first meeting" (Exhibit 47). In that same article, the Planning Director stated, "When you have a high degree of predictability, investors like that" (*Id*.).

144.   Plaintiffs realized that, as to their site plan applications for the Crooks Road Townhomes Project, Hills West and the Westington Phase II properties, the City's analysis did not end with a recommendation.

145.   On May 9, 2022, plaintiffs asked the City if they could expect a recommendation if the plans were revised and updated according to the comments in the reports provided by the City (Exhibit 48).

146.   In an attempt to seek transparency and put an end to the "hide the ball" games which the City was playing with plaintiffs as to

the zoning ordinance requirements for a by-right site plan application, Arban Stafa requested what plaintiffs would need to do to receive a recommendation from the planning department (*Id.*).

147.   Arban Stafa asked, in multiple subsequent email correspondence, what plaintiffs would need to do to the plans obtain a recommendation from City Planning Department (*Id.*).

148.   The City refused to provide any straightforward answers as to how plaintiffs could update the plans to obtain a recommendation from the Planning Department.

149.   Then, in the next month, June 2022, plaintiffs noticed that the City's reports for the items on the agenda had been changed so that all recommendations were withheld.

150.   The City enacted the policy change of removing any and all recommendations from reviews of site plan applications in June, 2022 without notice and without any discussion or vote at a Planning Commission meeting or City Council meeting.

151.   Shocked by this abrupt change in policy which occurred only after plaintiffs requested feedback on the site plan applications,

plaintiffs researched this matter and learned that the City had an

extensive history of providing recommendations for site plan review

letters and had been issuing recommendations for over 33 years.

152.  Arban Stafa sent to the City email correspondence on

August 24, 2022 regarding this radical change from the pattern and

history of how the City acted as to site plan applications, and even

included a portion of a site plan review from the Planning

Commission meeting of December 12, 1989, showing that

recommendations were included as far back as that date (Exhibit 49).

153.  At a meeting on August 23, 2022, among plaintiffs, the

Assistant City Attorney, the City Planning Director and the City

planning consultant, the City representatives told plaintiffs that the

deletion of recommendations was a "change in policy."  Arban Stafa

summarized this meeting in email correspondence to the City sent on

August 24, 2022 (*Id.*).

154.  In response, the City sent plaintiffs email correspondence

which stated, "The decision to discontinue providing

recommendations evolved over a period of time based on feedback

from members of Troy's Planning Commission. It is not

unconstitutional to refrain from providing a recommendation concerning a preliminary site plan review" (Exhibit 50).

155.   However, review of the City records shows that there is no evidence of any Planning Commission discussions, notices or requests for the removal of recommendations, a common City policy for over the past 33 years.

156.   The Michigan Zoning Enabling Act, M.C.L. 125.3303(2), provides that "The zoning commission shall consider any information and *recommendations* furnished by appropriate public officials, departments or agencies" (emphasis added).

157.   Under M.C.L. 125.3303(2), the Planning Commission shall consider recommendations from the planning professionals, not request that their recommendations be removed as the Planning Commission began to do as of mid-2022.

158.   The City continued to harass plaintiffs by whatever means it could.  For example, on November 18, 2022, David Barkeley and Sam Stafa sent correspondence to the City of Troy Building Department regarding the extensive costly delays, unprofessional, disrespectful and condescending treatment which they received from

one of the City's inspectors, Jeff Sargent (Exhibit 51, with cover email correspondence dated November 21, 2022).

159.  The City Council agenda for August 21, 2023 indicated that it would consider releasing a draft amended City of Troy Master Plan for a 63-day public review period (Exhibit 52).

160.  On August 14, 2023, Robert J. Bruner, Deputy City Manager, Meg Schubert, Assistant City Manager and R. Brent Savidant, Community Development Director sent to the City Council regarding "CITY OF TROY MASTER PLAN - Release Draft Master Plan for Public Review" (Exhibit 53).

161.  Plaintiffs' McClure and Alpine Drive properties were not included as part of the revised City Master Plan.

162.  Yet on August 21, 2023, just before the City Council meeting, at the direction of Mayor Baker, there was a late submittal to "adjust" the Big Beaver boundary line, removing plaintiffs' McClure and Alpine Drive properties from the BB (Big Beaver) District (Exhibit 54).

163.  The revised Future Land Use Map was not even approved by the Planning Commission, yet it was presented to the City Council on August 21, 2023.

164.   This action was directed solely against plaintiffs, as the August 21, 2023 late submittal demonstrates, as it refers only to the areas owned by plaintiffs on Alpine and McClure and on the intersection of Crooks Road and Wattles (*Id*.).

165.   On December 11, 2023, plaintiffs attempted to submit a rezoning application to the City, in the same manner as would any other developer, but R. Brent Savidant advised plaintiffs that they could not submit the rezoning application to the City Planning Department but instead had to submit it to Assistant City Attorney Julie Q. Dufrane.

166.   On December 11, 2023, Arban Stafa sent email correspondence to Assistant City Attorney Dufrane, with the applications attached.

167.   On December 27, 2023, Arban Stafa sent the applications with payment for the required City fee to the City Attorney's office by Federal Express (Exhibits 55 and 56).

168.   On January 4, 2024, Assistant City Attorney Dufrane sent email correspondence to plaintiffs' counsel, indicating that the applications were being returned unprocessed because there was an appeal before the Michigan Court of Appeals as to the properties,

without reviewing the applications as to what the rezoning requests constituted (Exhibit 57).

169.  The City has also taken other retaliatory actions against plaintiffs, including not issuing permits to which they were entitled on other projects in the City, and after a history of issuing recommendations, ceasing to do that when it is a project of plaintiffs.

170.  The City has no legitimate basis for its actions against plaintiffs.

171.  The City's actions in blocking and preventing plaintiffs from developing their properties were unwarranted and wrongful and part of a municipal policy to wrongfully harass plaintiffs and were in retaliation for plaintiffs having exercised their First Amendment rights to seek redress from the courts.

172.  Because of the City's actions, plaintiffs have been significantly damaged, including but not limited to the loss of the income from the development of the properties, the loss of the increased asset valuation of the properties once they were developed, the loss of goodwill and reputation and other damages.

173.  By treating plaintiffs differently than similarly-situated property owners and developers to plaintiffs' detriment, the City has

- 43 -

violated plaintiffs' right to equal protection of the law, as guaranteed under the Fourteenth Amendment of the United States Constitution.

174.   By depriving plaintiffs of their right to petition the government and speak to the Township's staff and elected officials, and by taking retaliatory actions against plaintiffs, the City has violated plaintiffs' constitutional rights, as guaranteed under the First Amendment of the United States Constitution.

175.   The City's actions toward plaintiffs are harassing and have made it unfeasible for a successful development of plaintiffs' properties.

176.   The City's actions have caused plaintiffs to suffer injury and economic loss, and to incur other compensable damages.

177.   The City's actions have had a negative impact on plaintiffs' goodwill and reputation.

178.   The City has made it clear that it will never let plaintiffs develop their properties.

179.   Because of the nature of the injuries which the City has inflicted and will continue to inflict on plaintiffs, plaintiffs may not have a complete remedy at law and therefore seek injunctive relief from this Honorable Court.

180.  The incidents set forth in the preceding paragraphs are just a few examples of the unlawful harassment directed by the City against plaintiffs.

181.  The City's policy to unlawfully harass plaintiffs and deny plaintiffs their fundamental rights has caused plaintiffs injury in their business and property.

182.  The City has knowingly and intentionally caused plaintiffs to be unable to recoup anything from the large amount of money and time plaintiffs have invested in their properties or obtain the profits which they would have received upon development of the properties.

183.  The City's wrongful and harassing activities are municipal actions and are inherently arbitrary and a deliberate misuse of governmental power.

## COUNT I

### Deprivation of Rights under the First Amendment
### Brought Pursuant To 42 U.S.C. §1983

184.  The allegations set forth in paragraphs 1 through 183 are incorporated herein by reference.

185.  The City, through its actions, has deprived and continue to deprive plaintiffs of federally protected rights, privileges and immunities provided by federal law and the United States

Constitution, and plaintiffs are thereby entitled to damages for the City's deprivation of plaintiffs' constitutional rights under the First Amendment to the United States Constitution, for which plaintiffs can bring a claim through the mechanism of 42 U.S.C. §1983.

186.  The United States Supreme Court has held that the First Amendment protects against retaliation for speech on matters of public concern and affords citizens the right to petition their government for redress.

187.  The United States Supreme Court has held that a government may not deny a benefit to a person on the basis that infringes on his constitutionally protected interests, including the right to criticize the government on matters of public concern.

188.  Plaintiffs had the right to petition the government by filing suit against the City.

189.  Plaintiffs had the right to petition the governing body of the City Council for redress without retaliation.

190.  Plaintiffs had the right to criticize the City's actions and bring to their attention matters of public concern.

191.  The retaliatory actions of the City against plaintiffs based on plaintiffs' exercise of their rights under the First Amendment to the

United States Constitution deprived plaintiffs of their constitutionally-protected rights under the First Amendment to the United States Constitution.

192.  The policies and actions of the City were based on considerations other than those proper to the good-faith administration of justice and lay far outside the scope of legitimate action.

193.  As a direct and proximate result of the actions of the City, plaintiffs have suffered and continue to suffer injury, including irreparable harm.

194.  Because of the nature of the actions of the City, which had the effect of destroying the business opportunities of plaintiffs, plaintiffs do not have a complete and adequate remedy at law, and injunctive relief is necessary.

195.  Because of the retaliatory actions by the City against plaintiffs for their exercise of their rights under the First Amendment to the United States Constitution, and because the City's actions show reckless disregard and callous indifference for plaintiffs' federally protected rights, plaintiffs are entitled to all compensatory and other

damages incurred, including costs and attorney fees pursuant to 42 U.S.C. §1988.

WHEREFORE, plaintiffs respectfully request that this Honorable Court enter an order granting the relief requested in the Request for Relief below and enter a judgment in their favor and against the City for their damages, plus costs, interest and attorney fees.

## COUNT II

**Deprivation of Rights to Equal Protection of the Law
Brought Pursuant To 42 U.S.C. §1983**

196.  The allegations set forth in paragraphs 1 through 195 are incorporated herein by reference.

197.  The City, through its actions, have deprived and continues to deprive plaintiffs of federally protected rights, privileges and immunities provided by federal law and the United States Constitution, and plaintiffs are thereby entitled to damages for the City's deprivation of plaintiffs' constitutional rights to equal protection of the laws, for which plaintiffs can bring a claim through the mechanism of 42 U.S.C. §1983.

198.  The City's actions in selectively targeting plaintiffs and their properties, as set forth in the preceding paragraphs, for enforcement of alleged internal procedures and for not approving site plans for plaintiffs' properties deprived plaintiffs of their constitutionally-protected right to equal protection of the law under the Fourteenth Amendment of the United States Constitution.

199.  Plaintiffs were selectively treated in adverse ways by the City, as set forth in the preceding paragraphs.

200.  Plaintiffs were treated adversely and differently than other property owners, who were similarly situated to plaintiffs, based on plaintiffs' religion, as Stafa is Muslim.

201.  The City has a pattern and practice of treating Muslims differently than others similarly-situated and adversely.

202.  Plaintiffs were treated adversely and differently than other property owners, who were similarly situated to plaintiffs, and plaintiffs constitute a class of one.

203.  The policies and actions of the City were based on considerations other than those proper to the good-faith administration of justice and lay far outside the scope of legitimate action.

- 49 -

204. As a direct and proximate result of the City's actions, plaintiffs have suffered and continue to suffer injury, including irreparable harm.

205. Because of the nature of the City's actions, which had the effect of destroying the business opportunities of plaintiffs, plaintiffs do not have a complete and adequate remedy at law, and injunctive relief is required.

206. Because of the City's deprivation of plaintiffs' rights to equal protection of the law, and because its actions show reckless disregard and callous indifference for plaintiffs' federally protected rights, plaintiffs are entitled to all compensatory and other damages incurred, including costs and attorney fees pursuant to 42 U.S.C. §1988.

WHEREFORE, plaintiffs respectfully request that this Honorable Court enter an order granting the relief requested in the Request for Relief below and enter a judgment in their favor and against the City for their damages, plus costs, interest and attorney fees.

## <u>REQUEST FOR RELIEF</u>

Plaintiffs Safet Stafa, Tollbrook, LLC, Tollbrook West LLC,

Tollbrook North, LLC and Arban Stafa respectfully request that this

Honorable Court enter a judgment for actual, compensatory,

incidental and consequential damages on all of plaintiffs' claims in an

amount to be determined by a jury and entered by this Honorable

Court, plus costs, interest, exemplary damages, and attorney fees,

and that this Honorable Court also enter an order that:

A.     Preliminary and permanently enjoins the City of Troy and

its agents, successors, representatives, assigners or any or person or

entity acting for or on its behalf, from depriving plaintiffs of their

constitutional rights in retaliation for their exercise of their rights under

the First Amendment of the United States Constitution and from

denying plaintiffs equal protection of the laws and their rights under

the Fourteenth Amendment of the United States Constitution;

B.     Preliminary and permanently enjoins the City of Troy and

its agents, successors, representatives, assigns or any other person

or entity acting for or on its behalf, from conspiring to violate plaintiffs'

constitutionally-protected rights;

C.      Awards plaintiffs, pursuant to 42 U.S.C. §1988, their

costs, attorney fees, interest, lost profits, and all other damages as

against the City of Troy.

D.      Awards plaintiffs their attorney fees for having to bring this

action;

E.      Awards plaintiffs both pre-judgment and post judgment

interest on each and every damage award; and

F.      Awards any other and further relief to plaintiffs as this

Honorable Court deems just and proper.


                                        Respectfully submitted,


                                        /s/ Cindy Rhodes Victor
                                        CINDY RHODES VICTOR (P33613)
                                        The Victor Firm, PLLC
                                        29777 Telegraph Road, Suite 2410
                                        Southfield, Michigan  48034
                                        (248) 905-3990
                                        cvictor@victorfirm.com

Dated:  February 19, 2024        Attorneys for Plaintiffs

## **<u>DEMAND FOR JURY</u>**

Plaintiffs Safet Stafa, Tollbrook, LLC, Tollbrook West LLC,

Tollbrook North, LLC and Arban Stafa, by and through their counsel,

hereby demand a trial by jury on their causes of action against

defendant the City of Troy.


Respectfully submitted,


<u>/s/ Cindy Rhodes Victor</u>
CINDY RHODES VICTOR (P33613)
The Victor Firm, PLLC
29777 Telegraph Road, Suite 2410
Southfield, Michigan  48034
(248) 905-3990
cvictor@victorfirm.com

Dated:  February 19, 2024          Attorneys for Plaintiffs